## IN THE UNITED STATES DISTRICT COURT FOR THE

## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CHARLES GIBBONE<br>925 Beatty Road<br>Springfield, PA 19064<br>Plaintiff,<br><br>v.<br><br>SOUTHEAST DELCO SCHOOL<br>DISTRICT, 1560 Delmar Drive Folcroft, PA<br>19032<br><br>*And*<br><br>CRAIG BUTLER, individually and in his<br>official capacity as Chief Operating and<br>Financial Officer of Southeast<br>Delco School District, 1560 Delmar Drive<br>Folcroft, PA 19032<br>Defendants. | **Civil Action No.:** _____<br><br><br>JURY TRIAL DEMANDED |

## **COMPLAINT**

COMES NOW Plaintiff, Charles Gibbone ("Plaintiff"), hereby files this Complaint against

Defendants Southeast Delco School District (the "District") and Craig Butler ("Butler"),

individually and in his official capacity as Chief Operating and Financial Officer of the District,

and in support thereof avers as follows:

## INTRODUCTION

1.)        Plaintiff worked as a contracted IT technician for the District from March 2023 to April 30, 2024. During that time, he repeatedly raised alarms about serious technology mismanagement, waste of taxpayer funds, and safety hazards in the District's operations. These concerns — ranging from unused student technology to dangerous infrastructure conditions — are detailed in the factual allegations below.

2.)        In late April 2024, after Plaintiff applied for a permanent IT position and voiced criticisms of the District's financial and technological mismanagement (including an email to Defendant Butler and a request to address the School Board), the District abruptly terminated his contract on April 30, 2024. Plaintiff believed this sudden termination was in retaliation for his whistleblowing activities.

3.)        Defendants engaged in unconstitutional retaliation against Plaintiff for his protected speech on matters of public concern in violation of his First Amendment rights and in violation of the Pennsylvania Whistleblower Law, continuing a documented pattern of retaliating against employees who report financial misconduct and waste.

## JURISDICTION AND VENUE

4.)        This Court has subject matter jurisdiction over Plaintiff's federal law claims pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a)(3) and (4).

5.)        This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a), as these claims are so related to the federal claims that they form part of the same case or controversy.

6.)        Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because all Defendants reside in this district and a substantial part of the events or omissions giving

rise to the claims occurred in this district.

## PARTIES

7.)        Plaintiff Charles Gibbone is an adult individual and resident of Pennsylvania who

was employed as a contracted IT technician for the District from March 2023 through

April 30, 2024.

8.)        Defendant Southeast Delco School District is a public school district and

municipal entity organized and existing under the laws of the Commonwealth of

Pennsylvania with its principal place of business at 1560 Delmar Drive, Folcroft, PA

19032. At all relevant times, the District acted under color of state law and is a "person"

subject to suit under 42 U.S.C. § 1983.

9.)        Defendant Craig Butler is an adult individual who, at all relevant times, was

employed as the Chief Operating and Financial Officer, Right-to-Know Officer, and

Board Secretary for the District. Defendant Butler is sued both in his individual capacity

and in his official capacity. At all relevant times, Defendant Butler acted under color of

state law and is a "person" subject to suit under 42 U.S.C. § 1983.

### *FACTUAL ALLEGATIONS: Plaintiff's Employment with Defendant District*

10.)        Plaintiff worked as an IT technician for the District through Robert Half from

March 2023 to April 30, 2024. His initial two-month assignment was extended multiple

times. District officials discussed hiring him full-time (Exhibit W-2). The vendor contract

required 30 days' notice for termination (Exhibit Q-3), which the District did not provide.

11.)        Plaintiff performed his duties professionally, with no documented issues or

disciplinary actions. He received positive feedback from supervisors, including praise for

'exceptional IT support' (Exhibit V), 'impressive' knowledge, and 'highest

recommendation' for work ethic (Exhibits W-1, R-4). Sworn attestations confirm no records of issues exist (Exhibit P-3).

12.)      During his 14-month tenure, Plaintiff was assigned building-wide technology support responsibilities across multiple District sites, primarily at Academy Park High School (APHS) and Sharon Hill School (SHS). At APHS, he was supervised by Principals Richard Sherin and Latarsha Threadgill (Exhibit V). At SHS, he was supervised by Principals Nathaniel Robinson and Daniel Ruane (Exhibit R-4). Tasks included repairing laptops and distributing Chromebooks amid "over 1600 ECF Chromebooks that are just sitting over at ESC (Educational Service Center")" (Exhibit E), and documenting hazards such as "exposed wiring" and "ceiling leaks near electronic equipment" (Exhibit J[1]). While these were outside his original break/fix duties, the post-scandal staff-turnover left the department severely understaffed, prompting Plaintiff to take the initiative to address critical infrastructure issues to ensure school operations continued without disruption (Exhibit J; Exhibit E).

13.)      Plaintiff's work was primarily assigned by Judy Orner, the Technology Supervisor and main contact for Robert Half (Exhibit X). Orner, along with IT Director Sunni Jennings, directed daily operations, granted Plaintiff HelpDesk administrative access, and integrated him into the technology team.

14.)      Plaintiff was entrusted with IT system privileges, inventory control, and on-site repairs – work that was integral to keeping the District's schools running. He even expended his own resources to keep technology functioning, using his personal vehicle to

---

[1] Exhibit J is an infrastructure report Plaintiff began compiling prior to his termination. Much of its content reflects issues he intended to present at a school board meeting with two former students. Plaintiff did not send the report at that time, as he sought to corroborate its contents through additional Right-to-Know requests, which later led to the inclusion of further post-termination information.

deliver student Chromebooks between buildings and printing materials at his own
expense to speed up Chromebook distribution.

15.)        Plaintiff identified financial waste, such as unused supplies worth thousands, and
safety hazards like exposed wiring (Exhibit E). He emailed supervisors about
disorganization from a 'wait until it breaks' approach, leading to high turnover.

16.)        The District's actions showed it viewed Plaintiff as essential: his contract was
repeatedly extended and supervisors noted "all had great things to say" about his work
(Exhibit W-1). Yet despite this anticipated permanency, the District terminated Plaintiff
without the required 30-day notice (Exhibit Q-3) and with no documented performance
issues (Exhibit P-3). This abrupt, undocumented firing starkly contradicted the District's
prior treatment of Plaintiff as a valued long-term asset.

17.)        Although Plaintiff's paycheck came from Robert Half, his day-to-day work was
fully directed and controlled by District administrators and the IT department, who
assigned tasks, determined schedules, and evaluated performance (Exhibit H; Exhibit I).
Plaintiff was granted HelpDesk administrative access and treated as an integral part of the
technology staff, further evidence of the District's operational control.

### *District's Established Pattern of Retaliating Against Financial Whistleblowers*

18.)        The District has an established pattern and practice of retaliating against
employees who report financial misconduct, waste, or other concerns about the District's
operations, as demonstrated by the treatment of multiple whistleblowers (Exhibit L;
Exhibit M). This custom is reinforced by systemic RTKL evasions, such as non-
participation and delays in appeals, where the District claimed emails "went unnoticed for

a time" (Exhibit P-2) or simply "did not participate" (Exhibit R-3; Exhibit T-2[2]: late response to tax records).

19.)     In June 2023, Director of Accounting Nikeya Fisher was escorted out of the District's premises by police and Defendant Craig Butler after she raised concerns to the school board about financial impropriety, including unauthorized funding of Superintendent Brenda Wynder's HSA account totaling over $10,000 (Exhibit L: "Craig Butler instructed her to fund Superintendent Brenda Wynder's HSA account from district funds in 2021-2022, totaling over $10,000, without HR approval"). Fisher's report on funds used for Wynder's treatments rejected by insurance exemplified impropriety.

20.)     Following Fisher's removal, her office locks were changed, and the office remained unused, demonstrating the District's swift and decisive action against employees who question financial practices (Exhibit L). This tactic of public humiliation was replicated in Plaintiff's case, where Butler thanked "the following team members for being present, at APHS, this morning" during the escort (Exhibit I), showing a deliberate method to intimidate critics.

21.)     Fisher's removal was reported by CBS Philadelphia on August 25, 2023, in connection with a payroll fraud scandal that resulted in approximately $120,000 in fraudulent billing, which destabilized the District administration (Exhibit M: "Southeast Delco superintendent resigns, teacher's aides accused of submitting false timecards... total loss is around $120,000"). The report noted "anonymous complaints about alleged financial misconduct" and board support for Wynder despite the "nonsense," aligning

---

[2] Due to the Eastern District of Pennsylvania's local rules limiting attachments to 50 pages for electronic filings, only select key exhibits are attached to this complaint. The full set of exhibits A-Z, comprising approximately 283 pages, will be served on the defendants pursuant to Fed. R. Civ. P. 4 and mailed to the Clerk of Court for the Eastern District of Pennsylvania.

with Plaintiff's concerns on payroll vulnerabilities (Exhibit J) and the scandal's fallout.

22.)     In the aftermath of the payroll fraud scandal, the District's administration underwent a mass exodus. The Superintendent abruptly resigned despite having a five-year contract, the Board President also stepped down, and several other top administrators left their posts – notably including IT Director Dan Kitchen, who departed for another district (Exhibit M). This wave of departures left the technology department severely understaffed. By the summer of 2023 it had dwindled to just Plaintiff and one other technician, a two-person skeleton crew. Plaintiff took note of the resulting high turnover and pervasive disorganization in the District, warning that these conditions were causing long-term harm (Exhibit E; Exhibit J).

23.)     Additional administrators Joan Galloway and Judy Orner filed for retirement, using accumulated sick days to wind down their employment by November 2023 and January 2024, respectively (Exhibit J). During this instability, Plaintiff documented ongoing issues like "The district last placed an order for student chromebooks in 2021," leading to expired warranties and makeshift fixes (Exhibit J), exacerbating the waste he reported.

*24.)*     By summer 2023, the District's IT department had been reduced to a two-person skeleton crew (Plaintiff and one other technician) after multiple administrators and staff left. In this strained environment, Plaintiff uncovered alarming technology failures across the District: outdated equipment and wiring, hazardous conditions (such as ceiling leaks near electronics), and a need to cannibalize broken devices to keep student computers working (Exhibit J). These acute problems drove Plaintiff to report urgent safety risks and waste to District leadership. His warnings directly challenged the entrenched

mismanagement in the District—echoing the concerns raised by prior whistleblowers—
and set the stage for the retaliation he would soon face.

### *Defendant Allocates $87,000 for Plaintiff*

25.)        In August 2023, the District executed a Budgetary Purchase Order (BPO
#2100635) allocating $87,000 to Robert Half for technology staffing services (Exhibit U-
1). At Robert Half's $40/hour rate for a 35-hour workweek, this funding covered over 14
months of full-time work, extending well past Plaintiff's April 30, 2024 termination date.
Plaintiff was the only Robert Half technician assigned to the District's technology team,
meaning the allocation in practice funded Plaintiff's role.

26.)        The $87,000 allocation was created solely as an "estimate for budgeting
purposes" without presentation to the School Board, without needs assessment, and
without supporting documentation of any kind (Exhibit U-2; Exhibit U-3). In a sworn
attestation to the Office of Open Records, Defendant Butler, acting as CFO, COO, and
ultimate overseer of the technology department, admitted that no staffing requests,
internal rate sheets, cost estimates, or projected hour breakdowns were used to determine
the $87,000 figure (Exhibit U-3).

27.)        Butler never met or evaluated Plaintiff during his tenure. No planning documents,
requests, or estimates supported the $87,000 figure (Exhibit U-3

28.)        The absence of budgetary or operational justification directly undermines any
claim that Plaintiff's termination was financially compelled. Rather, the record shows
that funding for Plaintiff's position was secured months in advance, making the April
2024 termination a discretionary act consistent with the District's pattern of retaliating
against employees who raised concerns about waste and mismanagement.

29.)        Plaintiff's position, being the only IT contractor funded by the $87,000 BPO,

placed him in a unique position to witness financial irregularities first-hand. His reports

of waste and his prior warnings about infrastructure vulnerabilities capable of facilitating

fraud like the $120,000 false timecard scandal (Exhibit M), challenged the same

leadership practices that had already prompted retaliation against other employees.

### ***Plaintiff Identifies and Reports Serious Infrastructure and Resource Concerns***

30.)        Throughout his tenure, Plaintiff blew the whistle on pervasive technology

problems and safety hazards in the District's operations (Exhibits J, K). His reports –

coming during a time of payroll fraud scandal, administrative upheaval, and an

understaffed IT department – catalogued systemic failures: outdated infrastructure,

wasted resources, and dangerous conditions. In the summer of 2023, when Plaintiff and

one other technician were left covering all District schools, he personally observed

"widespread outdated infrastructure" and even used his own truck and fuel to deliver

Chromebooks to students (Exhibit J). He often criticized the District's "wait until it

breaks" attitude, noting that such leadership disorganization had caused years of high IT

staff turnover (Exhibit E). This context underscores that Plaintiff's speech addressed

serious public concerns, not mere personal gripes.

31.)        On October 11, 2023, Plaintiff emailed School Board President Sheree Monroe,

warning that the District's core network switch had reached end-of-life in 2014, creating

a single point of failure that could disable internet access for all schools. Monroe

forwarded the email to Defendant Butler, but Plaintiff received no response. In that same

email, Plaintiff raised concerns about barriers faced by contractors—such as no

PowerSchool access, no sick leave, and unpaid overtime—and urged administrators to

visit schools to see firsthand the "long-term harm to students" from chronic underinvestment in technology (Exhibit D).

32.)        The District had not purchased new student Chromebooks since 2021, so by 2023 most devices were out of warranty. To keep students equipped for class, Plaintiff and other technicians had to cannibalize broken Chromebooks for parts and create "makeshift fixes" (Exhibit J) – an improvisation that epitomized the District's wasteful, mismanaged approach.

33.)        At the time, the District's "Device Loan Agreement" policy imposed a $250 fine on students who broke or lost two or more District-issued Chromebooks. Plaintiff, his supervisors, and other IT staff routinely issued such fines — often for devices already in poor condition, many repaired or built from salvaged parts due to lack of replacements. Staff were unclear where the collected funds went. In a Right-to-Know affidavit, Defendant Butler claimed no Chromebook fines were collected from April 2023 to the present (Exhibit O). This was false — Plaintiff personally issued and processed multiple fines during this period.

34.)        In the summer of 2023, the District received approximately 2,500 Chromebooks — valued at nearly $1 million — through the federal Emergency Connectivity Fund ("ECF") grant program, intended to address student technology shortages. Each unit was brand-new and included a charger. Plaintiff and the technology department manually unboxed, inventoried, and configured all 2,500 devices for deployment to students.

35.)        The ECF Chromebooks were designated for students in grades 6 through 12, with distribution contingent on a signed parental consent form. These forms were sent to elementary schools, which had very few students in the eligible grades. Academy Park

High School — which served the largest population of eligible students — did not
receive these forms at all. This omission severely limited the intended impact of the
nearly $1 million federal grant, depriving the high school students who stood to benefit
the most.

36.)        To address the crisis, Plaintiff took personal initiative, using his own truck and
gasoline to transport Chromebooks to schools and printing over 1,000 ECF forms at his
own expense to facilitate distribution to students in need (Exhibit J: "Plaintiff took
personal initiative, using his own truck and gasoline to transport Chromebooks"). This
was necessary because the devices were "just sitting over at ESC" while "students were
failing classes due to lack of devices," violating grant intent and wasting funds (Exhibit
E; Exhibit K).

37.)        In January 2024, leadership changes further altered Plaintiff's chain of command.
In October 2023, building technician Ryan Paugh was replaced by Matt Miller, who was
directly hired by the District. In January 2024, Technology Supervisor Judy Orner retired,
and Miller was rapidly promoted the following Monday to Technology Supervisor,
becoming Plaintiff's direct supervisor while Plaintiff remained the only IT contractor.

38.)        On February 28, 2024, Plaintiff emailed Assistant Superintendent Jeffrey Ryan
about urgent technology failures. He reported that the District's core network switch was
dangerously obsolete and that about 1,600 federally funded Chromebooks were "just
sitting" in storage while students lacked devices (Exhibit E). Plaintiff said he had been
told to "wait until it breaks" and stressed that the problem was leadership, not the IT
director, causing "high turnover." He requested a private meeting to provide supporting
documentation.

39.)        On March 5, 2024, Plaintiff emailed incoming Superintendent Dr. Sanchez and his secretary, offering to provide a 30+ page packet of documentation supporting his prior reports (Exhibit F). Plaintiff warned the business department could "randomly end" his contract, stated the new technology director and supervisor "have no idea what's really going on," and alleged another business department employee was "twisting" information. He requested prompt delivery of the packet to prevent suppression and noted that weekly technology meetings began only after news of Sanchez's arrival.

40.)        Plaintiff documented serious environmental and safety hazards including electrical deficiencies, widespread speaker and projector failures, fire code concerns, and OSHA violations in District buildings, such as exposed wiring, ceiling leaks near electronic equipment, and improper storage of technology near heat sources (Exhibit J: "Hazardous Storage and Fire Code Concerns... exposed wiring, ceiling leaks near electronic equipment"). These issues posed "potential safety risks to students and staff," with Plaintiff warning of "OSHA violations" and "fire code concerns" in detailed reports (Exhibit J).

41.)        Plaintiff uncovered that the District's TimeClock Plus payroll system had security vulnerabilities enabling unauthorized access, creating potential for fraud like the July 2023 incident that resulted in a $120,000 loss (Exhibit J: "The District's TimeClock Plus payroll system had security vulnerabilities"). This risk was acute given the scandal's "false timecards" and arrests, with reports of "anonymous complaints about alleged financial misconduct" (Exhibit M), aligning with Plaintiff's broader concerns on integrity.

42.)        Plaintiff identified and documented over $3,000 in wasted printer toner at Sharon Hill Elementary alone due to rapid technology purchases before the new superintendent,

Yamil Sanchez Rivera, started (Exhibit J: "Over $3,000 in printer toner at Sharon Hill Elementary alone"). This expenditure exemplified procurement flaws and "disorganization" amid the administrative "implosion" (Exhibit E; Exhibit J).

43.)    These reports and offers to provide supporting documentation addressed matters of significant public concern under the First Amendment, including: (1) safety risks to students and staff from hazards such as "exposed wiring" (Exhibit J); (2) waste of taxpayer funds on unused toner and undistributed federally funded Chromebooks (Exhibit J; Exhibit E); (3) misuse of federal grant funds intended for student education (Exhibit K); (4) inadequate security controls risking unauthorized payroll access (Exhibit J); and (5) critical infrastructure vulnerabilities, including an end-of-life network switch threatening District-wide operations (Exhibit D).

44.)    On January 29, 2024, Plaintiff's recruiter (Abby Fox) informed him that the District was posting a full-time Desktop Support position covering Academy Park High School and Sharon Hill School. Fox noted that the IT Director (Sunni Jennings) and Technology Supervisor (Matt Miller) "had great things to say" about Plaintiff's work (Exhibit W-1).

45.)    In early April 2024, Ryan visited unannounced, used Plaintiff's phone to call Butler, and announced his location. Plaintiff withheld his documentation packet; Ryan did not request it and left.

46.)     Later that month, Plaintiff was formally interviewed for the full-time position at the Education Service Center by Human Resources Assistant Megan Giunta, Jennings, and Miller. On April 29, 2024, Plaintiff received an email from the District's human resources department titled "Thank you for your interest," notifying him that he had not

been selected, despite performing the same duties for over a year with no documented performance issues and consistent praise from supervisors.

### *Protected Speech Leading to Plaintiff's Termination*

47.)       Later that day, on April 29, 2024, Plaintiff emailed Board President Sheree Monroe and Racquel Irons inquiring about how to speak at an upcoming board meeting, explaining that he planned to attend with two former students to address the Board regarding technology failures, operational breakdowns, and the resulting impact on staff and students (Exhibit C: "Hello, how do I, along with 2 other former students speak at a board meeting"). Irons replied confirming the process, noting the requirement to complete a comment card and adhere to a three-minute limit, but Monroe did not respond. Plaintiff's termination the next day effectively prevented this planned presentation, as District policy required that speakers be current employees or residents.

48.)       On April 29, 2024, the same day Plaintiff was notified via email that he had not been selected for the full-time Desktop Support position he had performed for over a year without any documented performance issues, Plaintiff sought clarification from both Technology Supervisor Matt Miller and Technology Director Sunni Jennings on why he was deemed not qualified. Miller responded that he had been "told to redirect you to Mr. Butler… as he is Sunni and I's supervisor" and offered only to write a recommendation letter (Exhibit H). Jennings likewise stated that Plaintiff should refer his question to Defendant Butler (Exhibit A). Plaintiff had never met or spoken with Butler during his 13-month tenure, underscoring the arbitrary nature of the decision-making process.

49.)       Later that same day, Plaintiff emailed Defendant Butler and IT Director Sunni Jennings, raising protected concerns about the District's failure to replace an end-of-life

core network switch, other infrastructure deficiencies, and what Plaintiff reasonably believed constituted misuse of taxpayer funds. Plaintiff wrote: "Craig, to my understanding, you are the Chief Financial Officer. A few months ago, you did not respond in time to an Overtime issue… At the same time, the Core Switch reached end of life in 2014—and if that goes out, all of the internet in every single building goes out."

50.)     Plaintiff further stated, "You may have a proven track record operating as the CFO. But I was wondering what your credentials are to make such big tech decisions… it's the teachers and the students that have already felt the effects" from "weak leadership" and "individuals nonchalantly messing with staff and taxpayer dollars" (Exhibit A).

51.)     Butler responded only to "confirm receipt" without addressing any of the substantive issues raised. This cursory reply came mere hours before Plaintiff's termination the next day, following directly after Plaintiff's rejection for the full-time role and his protected speech questioning the District's leadership, fiscal management, and decision-making process.

### *Plaintiff's Retaliatory Termination*

52.)     On April 30, 2024, the very next morning after sending the email to Defendant Butler and requesting to speak at a board meeting, Plaintiff was terminated without notice or explanation (Exhibit B: "your contract with the Southeast Delco School District was terminated effective Tuesday, April 30th due to professionalism in the workplace regarding communication"). The termination followed mere hours after the protected activities, with no prior warnings or documented issues (Exhibit P-3: "no such records exist").

53.)     Plaintiff was notified of his termination via phone call from his Robert Half

recruiter, Abby Fox, approximately five minutes before his arrival at work. Abby Fox

mentioned that the phone call was very brief and she had spoken to Mr. Butler, not Sunni

Jennings or Matt Miller (Exhibit B). The next day, Fox emailed confirming the reason as

"professionalism in the workplace regarding communication," a vague claim contradicted

by praise and no records (Exhibit B; Exhibit R-4).

54.)         When Plaintiff arrived at work on April 30, 2024, security personnel met him at

the door. His keycard access was immediately disabled, and he was promptly escorted

from the building by Technology Director Sunni Jennings, Defendant Butler, and security

staff. None of the school principals had been warned of his termination, so those present

were caught completely off guard. One assistant principal phoned Assistant

Superintendent Jeff Ryan for an explanation. Ryan in turn alerted Defendant Butler that

Plaintiff was in the main office; Butler arrived shortly thereafter – the first time Plaintiff

had ever met him in person. (Principal Richard Sherin was off-site at an event with the

new superintendent, Yamil Sanchez Rivera, during this incident.) Notably, while multiple

administrators participated in Plaintiff's public removal (Exhibit I email thanking staff

"for being present, at APHS, this morning), the District generated no incident reports or

written directives for the termination. Butler later confirmed under oath that "no such

records exist" (Exhibit S-2).

55.)         Plaintiff's district email and Windows login were immediately deactivated,

displaying "account disabled" when attempted access (Exhibit B). This immediate cutoff,

without the 30-day notice required by "We require a 30 days minimum notice" (Exhibit

Q-3), violated the vendor agreement and left no transition, impacting schools.

56.)         At the time of his termination, Plaintiff was provided no written notice or

explanation for the District's decision by the school district itself (Exhibit B). Later OOR appeals confirmed "no such records exist" for termination directives or incident reports (Exhibit S).

57.)    The next day, Plaintiff's recruiter informed him via email that the reason for his termination was due to issues regarding "professionalism in the workplace regarding communication" (Exhibit B). This rationale is contradicted by contemporaneous praise, such as "We wanted to take a moment to express our gratitude for the exceptional IT support" (Exhibit V) and references noting "excellent interpersonal communication" (Exhibit R-4), with sworn admissions of "no such records exist" (Exhibit P-3).

58.)    The termination occurred less than a day after Plaintiff's email to Butler and board inquiry (Exhibit C). It rendered him ineligible to speak at meetings per policy. Plaintiff had warned officials 'know I know something' (Exhibit G), and no performance issues were documented (Exhibit P-3).

59.)    The manner of Plaintiff's termination — an abrupt, public escort by security — directly paralleled the treatment of another District whistleblower, Director of Accounting Nikeya Fisher. Like Plaintiff, Ms. Fisher was physically escorted out after raising financial misconduct concerns (Exhibit L; Exhibit I). This repeated tactic of public removal demonstrates the District's pattern of humiliating and silencing employees who report wrongdoing, underscoring a custom of retaliation against whistleblowers.

### *Post-Termination Events*

60.)    On July 29, 2024, Plaintiff reapplied for the same IT position using the District's online system, even providing twelve professional references (all marked "Returned?

Yes" in the portal, Exhibit R-1). Despite his qualifications and history with the District, the application was automatically rejected. This time, Plaintiff received no response at all – unlike his April 2024 application which at least generated a formal rejection email – and there is no record of any substantive review of his candidacy (Exhibit R-5). The silent, instant rejection of a well-supported application further underscores the retaliatory context of Plaintiff's termination.

61.)    As a result of Plaintiff's Right-to-Know appeals, the District was compelled to produce a sworn affidavit from Defendant Butler dated February 6, 2025, admitting that the District "possessed no such written records" of any termination records at all, and no performance evaluations of any kind (Exhibit P-3). Butler further swore that "The Requester was not a School District employee and therefore was not subject to termination by the School District," despite Butler's direct involvement in Plaintiff's physical removal from District property, personal participation in the escort with security staff, and email thanking team members "for being present" during the incident (Exhibit I).

62.)    The affidavit also admitted no payment records to Robert Half exist, despite the $87,000 BPO and 13-month engagement (Exhibit U-1).

63.)    Butler's sworn admissions establish that the District not only had no evidence supporting the stated termination rationale of "professionalism in the workplace regarding communication," but also had no basic payroll or contract records for a long-term on-site worker who had been entrusted with core IT infrastructure responsibilities. This lack of records—both for performance and for payment—reflects systemic administrative breakdowns and poor fiscal oversight, lending further support to Plaintiff's

claims of arbitrary and retaliatory decision-making.

64.)       The absence of any performance records also contradicts contemporaneous praise from District administrators describing Plaintiff's "exceptional IT support," "excellent interpersonal communication," and "highest recommendation" (Exhibit V; Exhibit R-4). The fact that Butler simultaneously denies the District terminated Plaintiff while also having personally carried out the removal underscores the pretextual nature of the District's justification and demonstrates retaliatory motive.

65.)       In a separate Right-to-Know Law request (OOR Docket No. AP 2025-0281), Plaintiff sought a copy of the contract between the District and Robert Half relating to his IT services. The Office of Open Records noted in its Final Determination that the "submission record in this appeal closed on February 14, 2025," and that, as of February 28, 2025, "the District had not submitted any evidence or argument in the appeal," prompting the OOR to ask whether the District intended to participate. On March 6, 2025, the District requested a two-week extension—mirroring its repeated failure to timely respond in other appeals—while Plaintiff simultaneously requested equal time to review and respond. Ultimately, the OOR compelled disclosure, and the District produced the Robert Half vendor agreement (Exhibit Q), which expressly provides: "We require a minimum of 30 days' notice" for termination. Plaintiff's April 30, 2024 termination occurred with zero notice, in direct violation of this contractual provision, further evidencing the retaliatory and pretextual nature of the decision.

66.)       One of Plaintiff's RTKL appeals (OOR Dkt. AP 2025-1242) provides a telling example. In that case, the District requested a 30-day extension to respond but then failed to respond at all, which led to a default judgment in Plaintiff's favor. Despite effectively

losing the appeal, Defendant Butler submitted an attestation during the process asserting that the District had no records whatsoever regarding Plaintiff's July 2024 job re-application. Butler claimed the application was merely 'viewed but not considered' and that there were no emails or documents about the decision – aside from Butler's own email thanking staff for 'being present' during Plaintiff's April 30 escort from school (Exhibit R-3; Exhibit R-5). It bears noting that Plaintiff's July 2024 application included a dozen professional references, one of which stated that 'Charles is dedicated to the profession' (Exhibit R-4), underscoring how well-qualified he was."

67.)    In yet another appeal, the District was compelled to disclose communications and directives related to Plaintiff's April 2024 interview and termination. In a sworn affidavit, Defendant Butler claimed that no scoring rubric, interview notes, or evaluation forms existed because Plaintiff's application was "viewed but not considered," despite Plaintiff's formal interview by Human Resources Assistant Megan Giunta, Technology Director Sunni Jennings, and Technology Supervisor Matt Miller. Butler further attested that no incident reports, security footage, termination records, or other communications documenting the logistics of Plaintiff's removal existed, with the only responsive record being Butler's post-escort email thanking staff for "being present" at Academy Park High School that morning. These admissions directly contradict the documented interview process and the public nature of the escort, supporting an inference that the district deliberately concealed or failed to create records to obscure the pretextual basis for Plaintiff's termination (Exhibit S-1; Exhibit S-2; Exhibit I).

68.)    Collectively, these Right-to-Know determinations reveal a consistent pattern of untimely responses, sworn denials contradicted by documentary evidence, and the

absence of basic employment and contracting records for a long-term on-site worker—conduct consistent with a deliberate effort to obscure the retaliatory basis for Plaintiff's termination.

69.)    In the months immediately following Plaintiff's termination, Defendant District undertook what its own records describe as "a sweeping series of infrastructure improvements, technology upgrades, and modernization initiatives" – almost all of which occurred after Plaintiff had made protected complaints about unsafe and outdated technology. During Plaintiff's tenure, the District's computers and network experienced chronic breakdowns (including failing student Chromebooks and a lack of basic network security), and Plaintiff often had to resort to makeshift, ad-hoc fixes to keep the obsolete systems running. These same issues were later addressed through significant projects approved in the months after Plaintiff's departure (Exhibit Y).

70.)    On June 20, 2024 – just weeks after Plaintiff's termination – the Board approved an agreement to upgrade the District's human resources software, replacing the antiquated HR databases that had caused frequent errors during Plaintiff's tenure. The Board authorized funding in the amount of $24,570 for this new HR software implementation (Exhibit Y-1).

71.)    On August 15, 2024, the Board approved the installation of a new HVAC "split unit" to provide proper cooling for the technology office at Darby Township School, at a cost not to exceed $15,000 (Exhibit Y-2). This office – where Plaintiff and other IT staff regularly worked – had routinely reached extreme heat levels during Plaintiff's tenure due to an inadequate HVAC system. Plaintiff had made internal reports about the high temperatures and improvised cooling measures, and the HVAC retrofit was authorized

several months after Plaintiff's termination.

72.)     At a Board meeting on October 17, 2024, the District approved a series of district-wide technology upgrades to address long-standing deficiencies in network wiring and classroom devices. The Board ratified expenditures of approximately $385,000 to purchase new Dell Chromebook computers for students, $172,000 for new Dell laptops for staff, and about $112,000 to upgrade the district's communication wiring infrastructure. The Board also voted to implement ClassLink single sign-on ("SSO") software for all users to bolster account security (Exhibit Y-3).

73.)     On November 14, 2024, the Board approved a contract to implement a modern digital archiving solution for the District's records. The agreement with Reynolds Business Systems provided for digital archiving of all active and inactive special education files, at a cost of $94,418.69 (Exhibit Y-4). Before this project, the District maintained records through manual methods, a practice that Plaintiff had noted carried security and compliance risks under student privacy laws.

74.)     On February 20, 2025, the Board approved another round of large-scale technology and security upgrades. These included the purchase of 100 new Dell Latitude 3450 laptop computers for staff ($94,287), renewal and upgrade of the District's Wi-Fi access point licenses ($84,445), email filtering/security services ($45,968 combined), additional Chromebooks for student use, and installation of new building security hardware — including a PremSys dual-reader electronic entry system at Delcroft School ($27,607) (Exhibit Y-5). Items such as broken surveillance cameras, obsolete laptops, and limited building security capacity had been documented during Plaintiff's tenure.

### ***Ongoing Delaware County District Attorney Criminal Investigation***

75.)        Through these RTKL efforts, Plaintiff discovered in March 2025 that the District

is under active criminal investigation by the Delaware County District Attorney's Office

for fraud and public corruption (Exhibit N). The DA's April 2, 2025 denial stated "The

investigation remains active" and "Handled by the Special Investigations Unit under

Deputy District Attorney Douglas Rhoads" (Exhibit N).

76.)        On March 20, 2025, the Board approved a contract with Advanced Electronic

Security (through CM3 Building Solutions) to furnish and install a fully modernized

CCTV camera system at all District schools, at a cost not to exceed $498,701.00 (Exhibit

Y-6). During Plaintiff's tenure, numerous security cameras and related wiring were

nonfunctional. The March 2025 project replaced the camera system District-wide,

resolving an issue that had existed while Plaintiff was employed.

77.)        On March 22, 2025, Plaintiff submitted a Right-to-Know Law request to the

Delaware County District Attorney's Office seeking records related to financial

misconduct investigations at the District (Exhibit N). The request sought "Any and all

records related to investigations into fraud, embezzlement, or other financial misconduct

at Southeast Delco School District from January 1, 2023, to the present" (Exhibit N).

78.)        On April 2, 2025, the District Attorney's Office denied the request in a formal

legal brief and sworn affidavit, stating: "The investigation remains active," "The records

requested relate to a criminal investigation and are exempt," and confirming that the case

is "Handled by the Special Investigations Unit under Deputy District Attorney Douglas

Rhoads" (OOR Dkt. AP 2025-0845) (Exhibit N: "Deputy District Attorney Douglas

Rhoads confirmed that, if disclosed, the requested information could violate Section

708(b)(16)... Reveal the institution, progress or result of a criminal investigation"). This

formal confirmation was only obtained through Plaintiff's RTKL diligence.

79.)      This formal response legally confirms that, as of April 2025, the District remains under active criminal investigation for fraud and public corruption by the Delaware County District Attorney's Office Special Investigations Unit (Exhibit N). The exemption invoked because disclosure could "Deprive a person of the right to a fair trial" or "Hinder an agency's ability to secure an arrest" indicates the seriousness (Exhibit N).

### ***Damages Suffered by Plaintiff***

80.)      As a direct result of Defendants' actions, Plaintiff incurred substantial economic losses. Over the 15-month period from April 30, 2024 to July 27, 2025, he lost approximately $45,000 in wages (Exhibit Z-1). This figure is derived from his prior pay rate (about $735 per week, or $38,200 per year at $21/hour for a 35-hour week) and reflects the gap between his expected full-time earnings and the minimal income he could scrape together after termination (Exhibit Z-1). In essence, the District's retaliatory termination cost Plaintiff well over a year's worth of his livelihood.

81.)      Following his termination on April 30, 2024, Plaintiff was only able to secure part-time work on an "as-needed" basis for a law firm assisting in a Microsoft Cloud Migration sometimes earning as little as $180 per month during this 15-month period (Exhibit Z-1). This underemployment stemmed from reputational harm and the District's pretextual reason.

82.)      Plaintiff was unable to secure stable, comparable full-time employment since his termination until July 28, 2025, despite his qualifications and experience, resulting in substantial financial hardship from underemployment (Exhibit Z-1). The lack of stable income exacerbated emotional distress.

83.)        In addition to economic losses, Plaintiff has suffered non-economic damages including emotional distress, anxiety, sleep issues, humiliation from the public escort from the building, and severe damage to his professional reputation. The damage to Plaintiff's reputation is particularly significant given his previously exemplary professional standing, as evidenced by multiple references from District colleagues praising his performance, professionalism, and character (Exhibit R-4; Exhibit V). The escort in "full public view" (Exhibit I) and vague "professionalism" label hindered job prospects.

### *Tolling of the Pennsylvania Whistleblower Claim*

84.)        The Pennsylvania Whistleblower Law has a 180-day statute of limitations from the date of the alleged violation, which in this case would be April 30, 2024, when Plaintiff was terminated.

85.)        The statute of limitations for Plaintiff's Pennsylvania Whistleblower Law claim should be tolled for the following reasons:

86.)        The PWL's 180-day limitations period should be tolled under the discovery rule, as Plaintiff could not discover the retaliatory motive until February 2025 despite diligence. He filed over 20 RTKL requests from October 2024, but District obstructions—exorbitant fees (Exhibit P-1), extensions/non-responses (Exhibits Q-1, R-3), and false attestations (Exhibit S-1)—delayed revelations like no supporting records (Exhibit P-3).

87.)        Fraudulent concealment also applies, as defendants misled termination reason with "professionalism" rationale lacking evidence, suppressed via false sworn statements (Exhibit P-3). Equitable tolling is warranted due to extraordinary misconduct preventing

timely filing despite vigilance.

### *Equitable Tolling*

*88.)*       Independently of the above, this case warrants equitable tolling because Plaintiff did everything reasonably possible to pursue his rights, and still the Defendants' extraordinary misconduct delayed him. After his termination, Plaintiff essentially taught himself the RTKL legal process and filed over twenty records requests and appeals – yet he was met with constant stonewalling. The District's pattern of delay and misdirection went far beyond normal bureaucratic behavior. For example, the District demanded exorbitant fees for documents (Exhibit P-1) and then simply refused to participate in the resulting OOR appeals (Exhibit R-3). This kind of sustained obstruction prevented Plaintiff from filing his lawsuit on time, despite his vigilance. Given the District's institutional history of evading transparency (even unrelated public records requests often met silence or extreme delay – see Exhibit T-2), equity dictates that Defendants cannot benefit from their obstruction. The statute of limitations should be tolled so that Plaintiff is not penalized for the very delays Defendants caused.

### COUNT I: FIRST AMENDMENT RETALIATION (42 U.S.C. § 1983) (Against All Defendants)

89.)       Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

90.)       At all relevant times, Plaintiff engaged in speech protected by the First Amendment to the United States Constitution when he:

a. Internally reported numerous instances of technological failures, waste, and safety issues to District leadership — for example, warning that a core network switch was

dangerously outdated and that hundreds of funded student Chromebooks were going

unused — and even compiling a detailed packet of documentation for the administration

(Exhibits D, E, F);

91.)          b. Emailed Defendant Butler on April 29, 2024, sharply criticizing the District's

financial mismanagement and questioning Butler's decisions and qualifications regarding

major technology issues (Exhibit A)

92.)          Plaintiff's speech addressed matters of public concern, including:

a). Potential safety risks posed by outdated infrastructure affecting students, staff, and

visitors, such as "Hazardous Storage and Fire Code Concerns... exposed wiring" (Exhibit

J); b.) Wasteful spending and mismanagement of taxpayer funds, like "Over $3,000 in

printer toner at Sharon Hill Elementary alone" (Exhibit J);

c.)  Failure to distribute grant-funded equipment to students as intended, with devices

"just sitting over at ESC" while "students lacked adequate technology" (Exhibit E;

Exhibit K); d.) Inadequate cybersecurity measures that could expose sensitive data,

noting "security vulnerabilities enabling unauthorized access" (Exhibit J); and e.)

Financial mismanagement occurring within a school district already under criminal

investigation for fraud and corruption, where disclosure could "Reveal the institution,

progress or result of a criminal investigation" (Exhibit N; Exhibit M: "total loss is around

$120,000").

93.)          The speech exceeded job duties, addressing systemic issues as a citizen (e.g.,

beyond break/fix to policy critiques).

94.)          Plaintiff's interest in commenting upon these matters of public concern

outweighed any governmental interest in limiting his speech, particularly given the

District's ongoing criminal investigation and history of financial scandals (Exhibit M: "abrupt resignation of Superintendent Brenda Wynder"; Exhibit N). The speech did not disrupt operations but highlighted issues like "wait until it breaks" policies (Exhibit E).

95.) He (a) raised policy-level spending, safety, and grant-compliance issues to senior officials outside his day-to-day chain of command, and (b) separately invoked the right to address a public board meeting. See Garcetti v. Ceballos, 547 U.S. 410 (2006); Lane v. Franks, 573 U.S. 228 (2014); Hill v. Borough of Kutztown, 455 F.3d 225, 241–43 (3d Cir. 2006). Any interest the District had in workplace order is outweighed by the public interest in safe facilities, proper use of grant funds, and fiscal integrity.

96.) Independent contractors are protected against First Amendment retaliation by government clients to the same extent as employees. See Bd. of Cnty. Comm'rs v. Umbehr, 518 U.S. 668 (1996); O'Hare Truck Serv., Inc. v. City of Northlake, 518 U.S. 712 (1996).

97.) The temporal proximity (less than 24 hours), Mr. Butler's personal involvement in the on-site escort and access shutoff, and the District's sworn admission that it has no records of any performance issues, plausibly show Plaintiff's protected speech was a substantial or motivating factor and that Defendants cannot meet a Mt. Healthy defense. See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274 (1977); Kachmar v. SunGard Data Sys., Inc., 109 F.3d 173, 177 (3d Cir. 1997).

98.) Defendants have offered no valid, non-retaliatory rationale for firing Plaintiff. No performance problems were ever documented, and the lone negative comment regarding Plaintiffs "professionalism" is contradicted by Plaintiff's uniformly positive evaluations (Exhibits V, R-4) and the absence of any negative record (Exhibit P-3). This stark

contrast shows that his protected reporting was the true motive for termination.

99.)      Defendant Butler's direct involvement in Plaintiff's firing underscores the

retaliatory motive — especially given that Butler had never personally interacted with

Plaintiff before the termination (Exhibit U-3). As the District's COO/CFO and de facto

decision-maker in this matter, Butler's actions represent District policy.

100.)      As a direct and proximate result of Defendants' actions, Plaintiff has suffered

damages including lost wages exceeding $45,075 during a 15-month period of

underemployment, benefits, emotional distress, and damage to his professional reputation

(Exhibit Z-1). The reputational harm is evidenced by underemployment at "$20 per hour

with no benefits," sometimes "$180 per month" (Exhibit Z-1).

101.)      Plaintiff demands judgment against Defendants on Count I, compensatory and

punitive damages, attorneys' fees, costs, and such other relief as the Court deems just and

proper.

### _COUNT II: MONELL CLAIM (42 U.S.C. § 1983) (Against Defendant District)_

102.)      The District maintained a longstanding custom of publicly removing, discrediting,

or otherwise retaliating against personnel who report financial waste or misconduct. For

example, after the District's Director of Accounting, Nikeya Fisher, raised concerns of

financial improprieties, she was abruptly escorted from her office and terminated, with

her office locks changed (Exhibit L) – a scenario closely paralleled in Plaintiff's case.

Likewise, Plaintiff's own protected whistleblower communications were met not with

investigation or corrective action, but with silence and retaliation.

103.)      Plaintiff's detailed email to School Board President Sheree Monroe warning of

critical infrastructure failures was forwarded to Defendant Butler and then ignored

(Exhibit D). His subsequent offers to provide evidence to Assistant Superintendent Jeffrey Ryan (February 28, 2024) and to incoming Superintendent Dr. Yamil Sanchez (March 5, 2024) received no substantive response or intervention (Exhibits E, F). Instead of addressing Plaintiff's warnings, District officials monitored him and swiftly moved against him – for instance, Ryan made an unexplained, unannounced visit to Plaintiff's office in early April 2024 under the pretext of using his phone, then called Butler from Plaintiff's desk and left without discussing Plaintiff's reports. Shortly thereafter, Plaintiff was terminated and escorted out just like Fisher, the very next morning after he raised additional complaints. The District had even pre-funded Plaintiff's position well beyond his termination date (allocating $87,000 for his contract role), underscoring that his firing was a discretionary act in line with its retaliatory pattern rather than any budgetary necessity.

104.)    Moreover, the District consistently failed to create or retain documentation of such adverse actions, as confirmed by its sworn admissions that no records existed of any performance issues or termination decision regarding Plaintiff (Exhibit P-3). This pattern of retaliating against whistleblowers and then concealing or failing to document the retaliatory acts was so permanent and well-settled as to have the force of law, effectively constituting District policy. *See Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir. 1990) ("Custom may be established by proof of knowledge and acquiescence" by municipal decisionmakers in a pattern of unlawful conduct).

105.)    At all relevant times, Defendant Butler held multiple high-ranking roles in the District – including Chief Financial Officer, Chief Operating Officer, designated Right-to-Know Law Officer, and Board Secretary – thereby consolidating authority over

District finances, technology, and personnel operations in a single official. Acting in

these capacities, Butler personally orchestrated and carried out Plaintiff's termination: he

directed that Plaintiff's inquiries be sent to him, then coordinated and executed the on-site

escort and immediate revocation of Plaintiff's building and IT access on April 30, 2024.

District administrators acknowledged Butler's decisive authority in the matter – for

example, when Plaintiff asked why he was not selected for the full-time IT position, his

supervisors told him to "redirect" all questions to Butler, who was their own supervisor

and the ultimate decision-maker (Exhibit H; Exhibit A). The School Board, for its part,

either delegated to Butler (explicitly or by tacit practice) final policymaking authority

over contractor employment and termination decisions, or at minimum acquiesced in his

exercise of such authority – rendering his retaliatory acts tantamount to official District

policy. Alternatively, the Board (through President Monroe) and the Superintendent,

having been made aware of Plaintiff's whistleblower reports yet permitting his abrupt

removal, ratified Butler's decision with full knowledge that it was in retaliation for

protected activity.

106.)       Under any of these theories, Butler's actions as the key decision maker are

attributable to the District itself. *See Pembaur*, 475 U.S. at 481–83 (single decision by

final policymaker can establish municipal policy); *McGreevy v. Stroup*, 413 F.3d 359,

368–69 (3d Cir. 2005) (school board may delegate final authority to an official, making

that official's acts municipal policy); *Andrews v. City of Philadelphia*, 895 F.2d 1469,

1481 (3d Cir. 1990).

107.)       The constitutional violation was also proximately caused by the District's failure

to train or supervise its employees in proper recordkeeping and legal compliance,

reflecting deliberate indifference to the rights of those reporting misconduct. The District had no adequate policies or training to ensure that core personnel decisions, security incidents, and whistleblower complaints were documented and handled lawfully. This institutional neglect is evidenced by the complete absence of any contemporaneous records explaining or justifying Plaintiff's termination – a deficiency confirmed by Butler's sworn February 2025 affidavit admitting that the District possessed "no such written records" of the termination, any alleged performance issues, or even the basic incident reports of the April 30 escort (Exhibit P-3; Exhibit S-2).

108.)     The District's pattern of non-compliance with the Pennsylvania Right-to-Know Law (RTKL) further highlights this failure. In multiple RTKL proceedings, the District ignored deadlines or produced no evidence, requiring the Office of Open Records to compel disclosures. For instance, the District belatedly produced the Robert Half vendor contract only after an appeal, revealing a 30-day termination notice clause that the District had disregarded. In other cases, the District responded to RTKL requests with sworn denials that records existed, only to have that claim contradicted by evidence or later admissions. These consistent lapses show a systemic failure to train or supervise officials on maintaining records and respecting transparency obligations, allowing retaliatory conduct to occur and go undocumented.

109.)     The District's deliberate indifference to such oversight made it highly predictable that employees' constitutional rights would be violated without accountability. *See City of Canton v. Harris*, 489 U.S. 378, 388–90 (1989) (municipal liability lies where failure to train reflects deliberate indifference to constitutional rights); *Connick v. Thompson*, 563 U.S. 51, 61–63 (2011).

110.)        Each of the foregoing theories of municipal liability – the District's custom of

retaliation, the actions of a final policymaker, and its failure to train or supervise –

independently supports a claim that the District is liable under §1983. Collectively, they

demonstrate that the District's official practice or policy was the moving force behind the

violation of Plaintiff's First Amendment rights.

111.)        Plaintiff demands judgment against Defendant Southeast Delco School District on

Count II, and requests all remedies available under law, including compensatory

damages, reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988, and such

other and further relief as the Court deems just and proper.

### COUNT III: VIOLATION OF PENNSYLVANIA WHISTLEBLOWER LAW (43 P.S. § 1421 et seq.) (Against Defendant District)

112.)        Plaintiff incorporates by reference all preceding paragraphs as if fully set forth

herein.

113.)        Plaintiff qualifies as an 'employee' under 43 P.S. § 1422 due to District

supervision and integration (Exhibits I, Q-3). Alternatively, joint employment with

Robert Half applies. His reports were a substantial factor in the next-day termination.


### District is a public body within the meaning of the Pennsylvania Whistleblower Law

114.)        Plaintiff made good-faith reports of waste and wrongdoing to District officials,

reasonably believing they evidenced violations, especially amid the active DA fraud

investigation (Exhibit N)

115.)        The District took adverse action by terminating Plaintiff on April 30, 2024,

without 30-day notice (Exhibits B, Q-3), including escort and access deactivation

(Exhibit I).

116.)    For the reasons stated in the Tolling of the Pennsylvania Whistleblower Claim

section below, the statute of limitations for this claim should be tolled.

117.)    As a result, Plaintiff suffered lost wages over $45,075 (from $735/week to as low

as $180/month), lost benefits, emotional distress, and reputational harm during 15 months

of underemployment (Exhibit Z-1).

118.)    Plaintiff demands judgment against Defendant District on Count III,

compensatory damages, attorneys' fees, costs, and such other relief as the Court deems

just and proper.

## *DEMAND FOR JURY TRIAL*

119.)    Plaintiff hereby demands a trial by jury on all claims and issues so triable.

## *PRAYER FOR RELIEF*

120.)    WHEREFORE, Plaintiff respectfully requests that this Honorable Court: a. Enter

judgment in favor of Plaintiff and against Defendants on all counts;

121.)    b. Award compensatory damages for lost wages (over $45,075), lost Health and

Vision Insurance, emotional distress, and reputational harm, in an amount determined at

trial;

122.)    c. Award punitive damages against Butler individually for his reckless

involvement in the retaliation, including the escort and misleading statements (Exhibits I,

P-3);

123.)    d. Award reasonable attorneys' fees and costs under 42 U.S.C. § 1988;

124.)    e. Award reasonable attorneys' fees and costs under 43 P.S. § 1425;

125.)    f. Award pre- and post-judgment interest as permitted; g. Grant other relief as just,

including injunctive orders for: (i) expungement of negative notations; (ii) neutral references; (iii) anti-retaliation training and RTKL-compliant policies; and (iv) non-disparagement.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

Respectfully submitted,

Dated: 8/14/2025

Charles Gibbone Jr.

*Charles Gibbone*

925 Beatty Road

Springfield, PA 19064

Ca_gibbone@knights.neumann.edu

484-745-5025

***Pro Se Plaintiff***